IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*Electronically Filed*

| | | |
|---|---|---|
| ROBERT RAY REED | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-295-JHM |
| | ) | |
| GULF COAST ENTERPRISES AND | ) | |
| THE GINN GROUP, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

**THE GINN GROUP, INC.'S MEMORANDUM IN SUPPORT OF
RENEWED MOTION FOR SUMMARY JUDGMENT**

---

Comes the Defendant, the Ginn Group, Inc. ("the Ginn Group"), by counsel, and

pursuant to Fed. R. Civ. P. 56, submits this memorandum in support of its Motion for

Summary Judgment.

**I.       FACTS**

Defendant, the Ginn Group, incorporates by reference the factual background of

this matter as set forth in Defendant SourceAmerica's Motion for Summary Judgment

[DN 9], this Court's Memorandum Opinion & Order regarding the same [DN 20], and

the following:

Before being hired by Defendant Gulf Coast in 2011, Mr. Reed worked for at least two food factories and three trucking companies, often doing physically demanding work. (Reed deposition 65:18 – 73:10. Cited portions of Mr. Reed's deposition are attached as Exhibit A.) He was occasionally reprimanded by his employers, and he would sometimes leave on less than ideal terms. (Reed deposition 72:25 – 73:2.) ("I get issues with employers sometimes, and I – I get pissed off and quit.") His most recent employment before his employment with Gulf Coast was with TS Trucking, LLC from roughly 2004 – 2005 and then Certified Construction from 2005-2010. (Reed deposition 65:18 – 73:10.) His work routine at TS Trucking was grueling:

> I would be in that truck a lot of times 14 hours a day, 6 days a week; and then I still – I still had, like – like, close to a 45-minute ride home. Sometimes I had enough time to come home, take a shower, eat, and sleep for 4 hours, and go right back to work.

(Reed deposition 66:21 – 67:1.)

From 2005 – 2010, Mr. Reed worked full time for Certified Construction as a dump truck driver, and he was occasionally required to operate other machinery. (Reed deposition 60:17-63:11.) Certified Construction sold its business in 2010, and Mr. Reed drew unemployment until he was hired as a full time maintenance worker by Defendant Gulf Coast in October 2011. (*Id.*) During his employment with Gulf Coast, the Ginn Group employed Mr. Reed's supervisors. When he was hired by Gulf Coast, Mr. Reed's understanding was that his job duties would be limited to operating equipment, which consisted of simply involved sitting in the cab of whatever equipment he was being asked to operate. (Reed deposition 98:11-24.) Mr. Reed testified

that he was capable of maintaining employment as a truck driver and/or equipment operator at the time of his hire (Reed deposition 185:3-4.) Contrary to his expectations, Mr. Reed claims that he was regularly expected to perform manually taxing work of a facility rounds worker requiring him to be on his feet chopping and removing brush, etc. In point of fact, however, the position for which he was hired – and the positions of similarly situated employees of Gulf Coast – did contemplate physical labor. His personnel file includes a document that describes Mr. Reed's job summary, experience requirements, essential functions, and physical requirements. It states in relevant part that the individual must be:

> physically capable of lifting up to 50 pounds. Ability to frequently bend, crouch, walk, climb stairs and ladders, reach above head, sit (to drive) and lift up to 40 pounds regularly. Assist in lifting equipment and moving furniture when necessary. May be required to move or lift alone.

(Attached as Exhibit B [8-9/145].) Mr. Reed signed this document on November 1, 2011.[1] Mr. Reed testified that when he was hired, he advised that he would need to go to the doctor, occasionally during work hours. (Reed deposition 106:8-22.) His personnel file documents absences multiple times per month for medical appointments over the two years of his employment. (Reed leave requests, attached as Exhibit C. [Gulf Coast production response to RFD 11])

In December 2012, Mr. Reed requested an accommodation that relieved him from having to bend his right knee, which appears not to have been granted.

---

[1] Mr. Reed dated his signature January 11, 2011 (written 1-11-11), but this is almost certainly a mistake; the witness who signed the document dated it November 1, 2011 (written 11-1-11), and this was around the time Mr. Reed was hired.

Mr. Reed claims that he was subject to harassment on the basis of his alleged disability during his employment. In particular, he alleges that at least two Ginn Group employees, Gary Matthews and Dennis Vandiver, would sometimes refer to him as "Silent Bob," a reference to the more intelligent but quieter of a character duo, Jay and Silent Bob, who appear in several films together, the most popular of which are *Dogma* and *Jay and Silent Bob Strike Back.* Mr. Reed testified as follows regarding the "Silent Bob" comments:

> Q. And tell me how the Silent Bob comment is – is a, I guess, offensive or derogatory comment?
> A. Because I don't talk a lot, because I don't like to talk to people.
> Q. Okay.
> A. It really upsets me. It bothers me. It gives me a lot of anxiety. So the lunch room is – is very loud. It's crowded. There's not much room. I would sit outside on a bench and eat. And it's – I never say much, so I'm like Silent Bob from the movies.

(Reed deposition 191:24 – 192:10.) He testified that he was called "Silent Bob" "probably maybe, like, way over 40 or 50" times. (Reed deposition 222:20-21.)

On November 12, 2013, Mr. Reed was injured at work while using a weed eater. He completed the day's work, did not notify anyone of the injury, but sought medical attention at the end of the work day. (See Employee Report, attached as Exhibit D [118/145].) Though a worker's compensation evaluation concluded that he could return to work the next day with some restrictions (see Exhibit E [57/145]), Mr. Reed did not return to work, but sought and was granted FMLA leave. (See FMLA documents, attached as Exhibit F [17-19/145].) Mr. Reed never returned to work and now claims that he was either terminated or constructively discharged, which Defendant Gulf Coast

disputes. Mr. Reed claims he was "pretextually terminated" November 12, 2013, the date of his work injury (See Amended Complaint ¶ 158), but his personnel file includes email correspondence dated July 3, 2014 from Gulf Coast's HR manager to Mr. Reed's wife inquiring when Mr. Reed might be able to return to work without restriction. (Attached as Exhibit G [121-122/145].)

In his Amended Complaint, Mr. Reed asserts claims against the Ginn Group for (1) disability discrimination in violation of the Kentucky Civil Rights Act ("KCRA") under KRS 344.040; (2) civil conspiracy to violate the KCRA; (3) retaliation in violation of KRS 344.280; and (4) negligent hiring, retention, and supervision. These claims fall into two distinct categories: first, Mr. Reed alleges that the Defendants did not reasonably accommodate his disabilities in terms of his job assignments and retaliated against him both for requesting accommodation and for filing an EEOC claim; and second, that he was harassed because of his alleged disability, notably the "Silent Bob" nickname given because of his lack of sociability, which Mr. Reed (not a medical professional) relates to his PTSD.

The deposition of Mr. Reed was taken on October 2, 2017. Mr. Reed claims to have sustained psychological impairments such as PTSD from his years in "the service," which consisted of working for the Coast Guard for four years from 1987-1991. (Reed deposition 226:2-228:3.) Mr. Reed testified that his disabilities include:

1.  Degenerative disc disease in his lower back for which he is currently receiving no treatment or medication;

2.  Tinnitus in both ears which was diagnosed while he was in the service;

3.      Blurred vision which requires him to wear bifocals;

4.      Injury to his right knee while in the service for which he received shots and occasionally wears a brace;

5.      Plantar fasciitis;

6.      PTSD for which he takes Hydroxyzine and receives weekly therapy. Mr. Reed testified that he was recently hospitalized for a week related to his alleged PTSD, though he admits that he has never received a diagnosis of PTSD from any medical provider;

7.      Injury to his right ankle. Mr. Reed has not undergone any surgery or therapy for his ankle, and he refused to have it fused despite his physician's recommendation. He did file a worker's compensation claim as a result of this injury, which settled. He was released to return to work wearing a brace by orthopedist Dr. George Quill.

(Reed deposition 12-28; 213.) There is no evidence that either of the Defendants or their employees knew of most of these alleged deficits. In a letter of recommendation from the Kentucky Office of Vocational Rehabilitation, counselor Laketra Whitman wrote to Gulf Coast's HR department explaining that Mr. Reed's barriers from engaging in the competitive business community included "interpersonal skills, mood stability, decreasing motor skills, pain management, and poor self-image." (Letter to Adrian Wyer, attached as Exhibit H [11/145].) In fact, Mr. Reed testified that his current psychological issues, including insomnia, anger outbursts, anxiety, have drastically worsened since the filing of this lawsuit. (Reed deposition 213:15 – 214:21.)

Mr. Reed testified that his disabilities were severe enough in October 2011 that he should not have been working as a maintenance worker for Gulf Coast (Reed

deposition 185:5-9), but when asked about previous worker's compensation suits he has

filed, he testified:

> **I don't sit at a desk. I don't work in a safe office building in courtrooms. I'm on my feet under dangerous circumstances day in, day out lifting heavy things, packing this, dragging that, work around dangerous equipment, wearing safety equipment. And I work hard. I did a good job.**

(Reed deposition 237:15-20.)

Though Mr. Reed claims to suffer from multiple physical and psychological impairments, several of which he attributes to his November 2013 work injury, since November 2013 he purchased a motorcycle which he drives occasionally; he joined American Legion Riders (a motorcycle club associated with American Legion) with his wife; he has traveled to Murray State University numerous times to take his son back and forth to college; he has taken trips across the state and to Virginia; and he and his family took a cruise to the Bahamas in July of 2017 (though he was given a larger cabin and required to board the ship on a different entrance than the other passengers because he had a scooter). (Reed deposition pp. 241, 246-249.)

## II.     MEMORANDUM OF LAW

Mr. Reed's claims arising from violations of the KCRA fail as a matter of law because he has not demonstrated that he was disabled under Kentucky law. For an individual to be considered "disabled" for purposes of the KCRA, the individual's physical limitations to be substantially more serious than any of the disabilities, even taken as a whole, than those Mr. Reed claims to suffer from. Mr. Reed's claims of

harassment related to his alleged disabilities fails for similar reasons: the conduct of which he complains was neither severe nor pervasive, as required by Kentucky law to be actionable. Therefore, summary judgment in favor of the Ginn Group is appropriate.

**A. Mr. Reed's claims arising under the KCRA fail because he is unable to prove that he is disabled as defined by the KCRA.**

Mr. Reed alleges disability discrimination pursuant to the Kentucky Civil Rights Act ("KCRA"), codified in KRS 344.[1] In a claim arising under the KCRA, a plaintiff-employee has the initial burden of proving a prima facie case of discrimination or face dismissal of his discrimination claim. *Childers Oil Co., Inc. v. Adkins*, 256 S.W.3d 19, 25 (Ky. 2008); *see also Hammond v. Norton Healthcare, Inc.*, 2012 WL 5039465, at *3 (Ky. App. Oct. 19, 2012) (applying burden-shifting approach to a disability discrimination claim). If the plaintiff is able to establish a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse decision. *Childers*, 256 S.W.3d at 26. Once the employer satisfies this burden, to survive summary judgment, the plaintiff must then show by a preponderance of the evidence that the reason offered is pretextual. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005). Here, Mr. Reed is unable to demonstrate even a prima facie case of discrimination because he cannot show that he was disabled under the KCRA.

To make out a prima facie case of disability discrimination, a plaintiff must show that (1) he was disabled as that term is defined in the KCRA; (2) that he was "otherwise

---

[1]The KCRA was modeled after federal law, and Kentucky courts regularly interpret the Act consistently therewith and often cite to federal case law when interpreting discrimination claims. *See Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003). Therefore, this brief also contains citation to federal authority when supportive of the various arguments set forth herein.

qualified" to perform the requirements of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability. *Hallahan, v. The Courier Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004) (citation omitted). Here, Mr. Reed is unable to satisfy either the first or third prongs of his prima facie case, and thus his claims for disability discrimination fail as a matter of law.

### 1.   Plaintiff is not "disabled" under the KCRA.

Mr. Reed cannot meet the first prong of his prima facie case because he is not disabled under the KCRA. To prove he is disabled, Plaintiff must show that he (a) has a "physical or mental impairment that substantially limits one or more of [his] major life activities;" (b) has "a record of such an impairment;" or (c) is "regarded as having such an impairment." KRS 344.010(4).[2] **"[H]aving an impairment does not alone make one disabled for purposes of the Act"**; a plaintiff must show that the impairment **substantially limits** a major life activity, such as "walking, seeing, hearing, performing manual tasks, caring for oneself, speaking, breathing, learning, and working." *Howard*

---

[2] It is well established that Kentucky courts look to federal case law interpreting the Americans with Disabilities Act (ADA) when addressing disability discrimination claims. Notably, the ADA was amended by Congress in 2009 to expand the definition of disability, and the new definition is applied to <u>federal</u> claims under the ADA for alleged discrimination after 2009. *See Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 10 (6th Cir. 2012). Kentucky's legislature, however, has not similarly amended the KCRA and it retains the ADA's former definition of disability. *Compare* KRS 344.010(4) *with* 42 U.S.C. § 12102(2) (2006). The Kentucky Supreme Court and Court of Appeals have yet to comment on how Kentucky courts will address the new definition now applied by federal courts, but federal courts applying Kentucky law have consistently declined to interpret the KCRA under the amended federal law. *See e.g., Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 658 (W.D. Ky. 2012); *Darby v. Gordon Food Servs., Inc.*, 2015 WL 3622529, at *4 (W.D. Ky. June 9, 2015); *Dickerson v. City of Georgetown, Ky.*, 2015 WL 2401190, at *3 (E.D. Ky. May 20, 2015). Accordingly, this brief applies the definition of disability as it has been applied by Kentucky courts.

*Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) (emphasis added). "[A]n impairment which only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation." *Adams v. Louisville Jefferson Cty. Metro Gov't.*, 2009 WL 637294, at *6 (Ky. App. Mar. 13, 2009).

Mr. Reed claims a host of impairments from tinnitus to PTSD, but he has struggled to articulate how any these alleged impairments substantially limit his daily life other than to assert in general terms that that he has anger and anxiety issues for which he receives fairly regular treatment. Of course, "it is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment." *Meredith v. City of Versailles*, 2007 WL 4127676, at *2 (Ky. App. Nov. 21, 2007) (citation omitted); *see also White v. Honda of Am. Mfg., Inc.*, 241 F. Supp. 2d 852, 856 (S.D. Ohio 2003) ("[The] Court must focus on Plaintiff's life experiences, rather than a medical diagnosis of impairment.") (citation omitted). Therefore, Mr. Reed's record of regular therapy does not support his allegations. In fact, the fact that his PTSD is treated with medication and therapy tends to show he is not disabled; in *Atwell v. Hart Cty., Ky.*, 122 F. App'x 215, 219 (6th Cir. 2005), the Sixth Circuit held that the fact that the plaintiff's mental impairments "may be corrected or mitigated by medication … precludes his establishing that his impairments substantially limit him in a major life activity."

There is no credible evidence that Mr. Reed has an impairment that substantially limits any major life activity.[3] On the contrary, as he stated in his deposition, he has held physically demanding fulltime jobs over the last several years: "I'm on my feet under dangerous circumstances day in, day out lifting heavy things, packing this, dragging that, work around dangerous equipment, wearing safety equipment. And I work hard." The evidence developed in this case shows that Mr. Reed has been consistently, gainfully employed for the past couple decades in physically demanding jobs. He was occasionally disciplined or fired, but this was due to personal conflicts between Mr. Reed and his employers. As he put it, "I get pissed off and I quit." All of his employment has been full-time, sometimes working extremely long days in sometimes unforgiving working environments. This is not indicative of someone "substantially limited" from a major life activity.

Mr. Reed testified to other supposed impairments that do not affect any major life activity. Again, major life activities are those tasks central to daily life. *Howard Baer*, 127 S.W.3d at 593. Mr. Reed laments not being able to drive his motorcycle for long distances, though he admits he can still drive it. He complains of being given a larger room on the cruise ship because he has a scooter, but he admits he went on a cruise with his family just this year. Riding a motorcycle cross country and going in the same entrance as the other passengers on a cruise ship are not activities "central to daily life." *See id.; see also Catron v. Lexington Fayette Urban Cty. Gov't*, 2010 WL 2867725, at *3 (Ky.

---

[3]Whether an impairment substantially limits the major life activity of the plaintiff "may be resolved upon summary judgment under the appropriate circumstances." *Hallahan*, 138 S.W.3d at 707.

App. July 23, 2010) ("Evidence that a restriction inconvenienced [the plaintiff's] daily life or made his daily activities more difficult is insufficient."); *Honda of Am. Mfg., Inc.*, 241 F. Supp. 2d at 856 (holding "impairments which merely <u>affect</u> major life activities must be distinguished from those that <u>substantially</u> <u>limit</u> those activities") (emphasis in original). Many Americans not healthy enough to ride a motorcycle would not consider themselves disabled just for that fact. It would be a vast expansion of the current law to consider an inability to ride a motorcycle for long distances as a disability. *See Howard Baer*, 127 S.W.3d at 593 (noting disabilities are substantial limitations that make a person "unable to perform a major life activity that the average person in the general population can perform.").

Mr. Reed still drives, rides a motorcycle, goes on trips with his family, and at least from 1999 – 2013, was fairly consistently employed full time. In short, not only has he failed to show that he is disabled under Kentucky law, but his testimony shows affirmatively that he is not.

Mr. Reed may point to the fact that he receives disability benefits from the VA as evidence that he should be considered legally disabled, but, as he testified, he did not begin receiving these benefits until 2016, three years after he left his employment with Gulf Coast. Moreover, this assertion conflates Mr. Reed's status as disabled by the Veterans' Administration with being disabled under the KCRA. "Disability" is defined differently for purposes of veteran's benefits, social security, and in the employment and education contexts. (*See, e.g., How Disability is Defined in Various Contexts*, ASKVETSFIRST, http://helpdesk.vetsfirst.org/index.php?pg=kb.page&id=2113). Mr.

Reed may also use his employment at Gulf Coast as evidence of a disability, given that the employment program under which he was hired was intended to employ struggling veterans. Again, a finding that Mr. Reed has impairments or could benefit from a program such as Gulf Coast's is completely independent to the question of whether he is disabled under the KCRA.

With respect to the two other definitions of "disability" under KRS 344.010(4) – that the individual have a record of impairment that substantially limits his or her major life activities or is regarded as having such impairment – Mr. Reed has again failed to introduce any evidence tending to support either of these definitions. Though he has occasional personal disputes with his employers, his employment history is one of full-time, physically demanding work. And to satisfy the "regarded as having such impairment" definition of disability, the employer "must entertain misperceptions resulting from stereotypic assumptions not truly indicative of individual ability." *Howard Baer*, 127 S.W.3d at 594 (citations omitted). No discovery regarding either Defendant tends to show that either Ginn Group or Gulf Coast had any sort of misperceptions about Mr. Reed's abilities based off of stereotypic assumptions. Therefore, Mr. Reed cannot show under any definition under the KCRA that he was disabled.

Simply put, Mr. Reed's impairments cannot be characterized as creating substantial limitations on his daily life. Therefore, he has failed to demonstrate the first prong of his prima facie case, because he has no evidence of, or record of, any impairment that substantially limits one or more of his major life activities. On this

point alone, the Defendants are entitled to summary judgment, because a plaintiff is required to prove each element of his prima facie case or face dismissal. *See Childers,* 256 S.W.3d at 25.

### 2.    Plaintiff did not suffer an adverse employment decision because of a disability.

Mr. Reed's prima facie discrimination case also requires him to show that he suffered an adverse employment action <u>because of</u> his disability. *See Hallahan,* 138 S.W.3d at 706-07; *see also Hammond*, 2012 WL 5039465, at *5. Here, the only evidence supporting Mr. Reed's assertion that he was discharged is his own testimony. His personnel file, on the other hand, shows that Mr. Reed was not terminated; he just failed to return to work. In July 2014, eight months after Mr. Reed claims he was constructively discharged, Mr. Reed's employer was reaching out to his wife inquiring when he might return to work. Mr. Reed's failure to return is not an adverse employment action.

Mr. Reed also alleges that he received less than stellar performance reviews in retaliation for requesting accommodations, but a negative performance review, unless it is tied to or forms the basis of a concrete change in the terms of employment, does not constitute an adverse employment action. *Suyeyasu v. GE Supply*, 2007 WL 789658 (W.D. Ky. Mar. 13, 2007) ("Plaintiff has shown no adverse change in his employment status caused by … his performance review, nor has he shown that other employees did not receive similar reviews. Therefore, this Court finds that [the] performance review does not constitute an adverse employment action."); *Mensah v. Michigan Dep't of Corr.*, 621 F.

App'x 332, 335 (6th Cir. 2015) ("[I]n general a negative performance review unaccompanied by a change of position or a loss of pay is not an adverse employment action.") (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir.2008)).

Mr. Reed's personnel file contains no evidence that anyone intended to demote, reassign, fail to promote, or terminate him. Mr. Reed complains of the reduction in vacation hours available to employees, but this program was implemented for all employees regardless of their disability status.

To make out a claim for disability discrimination, Mr. Reed must show that he suffered an adverse employment action because of an alleged disability, but he had no "disability" as that term is defined by Kentucky law, and he Mr. Reed never received any adverse employment action for any reason. Accordingly, Plaintiff is unable to establish the third prong of his prima facie case.

**B. Even taking Mr. Reed's allegations as true, his harassment claims fail because he is unable to prove that any conduct he alleges was severe or pervasive as required by Kentucky law.**

Mr. Reed also alleges that he suffered harassment as a result of his alleged disability, but, even taking his allegations as true, those allegations do not involve conduct severe or pervasive enough to be actionable under the KCRA.[2]

To establish a hostile work environment actionable under the Kentucky Civil Rights Act, the employee must show that the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile

---

[2] Again, because the KCRA was modeled after federal law and Kentucky courts repeatedly cite to federal case law when interpreting discrimination claims, this brief refers to federal authority in support of its argument.

or abusive, that he or she subjectively regarded it as abusive, *and* that the employer tolerated or condoned the situation, or knew or should have known of the alleged conduct and did nothing to correct the situation. *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir. 2000). To demonstrate the "severe and pervasive" prong of the action, the conduct in question must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky. 1992) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986)). *See also Doss v. St. Claire Med. Ctr., Inc.*, 2014 WL 1093199, at *4 (E.D. Ky. Mar. 14, 2014) ("To be actionable pursuant to Title VII and its Kentucky counterpart, the workplace must be so permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

In *Leggett Wire*, the African-American plaintiff alleged a racially hostile work environment. He introduced evidence that a co-worker had used a racial slur towards another African-American employee on his first day of work, that a racially offensive and obscene cartoon had been passed around over five years earlier by another employee, that a supervisor had told a racist joke sometime in year prior to the plaintiff's termination, and that a different supervisor had referred to an African-American employee as a "gorilla." The Sixth Circuit held that these occurrences, even taken as a whole, were not severe or pervasive enough to establish discrimination under the KRCA.

Here, the conduct alleged was neither severe nor pervasive enough to be actionable. The conduct alleged – that Mr. Reed was repeatedly referred to as "Silent Bob" – does not even approach the severity of the conduct shown to have occurred in *Leggett Wire,* which was found not to be sufficiently severe or pervasive as to be actionable.

To the extent the implications of the Silent Bob comments are significant, some basic information on the character Silent Bob becomes necessary. Silent Bob is the foil to Jay, his more boisterous, but less thoughtful, counterpart. A website devoted to film character analysis describes Silent Bob as follows:

> quiet, deep, and smart. Silent Bob is true to his moniker – he rarely ever says a word, but when he does he wants to make sure that it's worth it. The few times that Silent Bob has opened his mouth, he's revealed himself to be an insightful and mature man who balances his friend Jay's puerile vulgarities with considered commentary.

*Silent Bob,* CHARACTOUR, https://www.charactour.com/hub/characters/view/Silent-Bob.Jay-and-Silent-Bob-Strike-Back.

More importantly, Mr. Reed does not even allege that the comments affected his employment; he was just insulted by them. To be clear, Mr. Reed is alleging that he was a victim of harassment by being given a nickname of a film character named for his reticence. Regardless of how many times Mr. Reed was called "Silent Bob" (he testified that it was "probably maybe, like, way over 40 or 50"), and assuming that these comments were intended to insult, being made fun of for being quiet 1) does not relate to Mr. Reed's alleged disability, and 2) does not even remotely approach the standard required to make out a claim for hostile work environment under the KCRA. Being

made fun of for personality traits is not actionable, but even if Mr. Reed's quietness were determined to related to his disability, the Silent Bob nickname does not create a hostile work environment.

Again, the conduct must be such that a reasonable person would find the conduct hostile and abusive (*Leggett Wire Co.*, 220 F.3d 752), and the workplace must be "so permeated with discriminatory intimidation, ridicule, and insult" that it alters the conditions of the victim's employment. *St. Claire Med. Ctr., Inc.*, 2014 WL 1093199. Here, no reasonable person would find this alleged insult hostile and abusive, but even if they did, not only does it seem unlikely that being called "Silent Bob" would alter the conditions of Mr. Reed's employment, but Mr. Reed does not even allege that it does. He testified that it bothers him and it gives him anxiety. If this is sufficient to make out a claim for disability discrimination, it is difficult to imagine what conduct (and alleged resulting anxiety) would not constitute discrimination, as long as the plaintiff could tangentially tie the conduct to her status as a member of a protected class (which, again, Mr. Reed has failed to do). Kentucky law does not allow for these types of slights to be actionable, and for good reason. Therefore, Mr. Reed's harassment claims fail as a matter of law.

III.   **CONCLUSION**

Mr. Reed is unable to sustain his burden of proof at this summary judgment stage. There is no evidence that he qualifies as disabled or was regarded as disabled under Kentucky law and, therefore, Plaintiff is unable to make out a prima facie case of disability discrimination. Similarly, even if Mr. Reed's assertions about the "Silent Bob"

comments directed at him are true, this is not severe or pervasive enough to be actionable as harassment under Kentucky law. Accordingly, the Ginn Group is entitled to summary judgment and dismissal of all claims against it.

Respectfully Submitted,

PHILLIPS PARKER ORBERSON & ARNETT, PLC

*/s/ Sean Ragland*
Sean Ragland
Nicholas R. Hart
716 West Main Street, Suite 300
Louisville, KY 40202
(502)583-9900 - Phone
(502)587-1927 - Facsimile
*Counsel for Defendant the Ginn Group, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system on the 11th day of January 2018:

Samuel G. Hayward
Samuel "Chip" G. Hayward
ADAMS HAYWARD & WELSH
4036 Preston Highway
Louisville, KY 40213
*Counsel for Plaintiff*

Craig L. Johnson
WHONSETLER & JOHNSON, PLLC
11901 Brinley Avenue
Louisville, KY 40243
*Counsel for Defendant Gulf Coast Enterprises*


    */s/ Sean Ragland*
    Sean Ragland
    Nicholas R. Hart

20