1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF KENTUCKY

3                        LOUISVILLE DIVISION

4

5

6    ROBERT RAY REED

7

8                                              PLAINTIFF

9

10   V.

11              CIVIL ACTION NO. 3:15-CV-295-JHM-CHL

12

13   GULF COAST ENTERPRISES, et al.

14

15                                             DEFENDANTS

16   _____

17

18            DEPOSITION FOR THE DEFENDANT,

19               GULF COAST ENTERPRISES:

20

21     The Deposition of Robert Ray Reed, taken in the

22   above-styled matter at Adams, Hayward & Welsh, 4036

23   Preston Highway, Louisville, Kentucky, on the 2nd day

24   of October, 2017, beginning at 9:02 a.m.

25

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF, ROBERT RAY REED:

 4      SAMUEL G. HAYWARD, ESQUIRE

 5      ADAMS HAYWARD & WELSH

 6      4036 Preston Highway

 7      LOUISVILLE, KENTUCKY  40213

 8

 9   FOR THE DEFENDANT, GULF COAST ENTERPRISES:

10      CRAIG L. JOHNSON, ESQUIRE

11      WHONSETLER & JOHNSON, PLLC

12      11901 Brinley Avenue

13      LOUISVILLE, KENTUCKY  40243

14

15   FOR THE DEFENDANT, THE GINN GROUP, INC.:

16      SEAN RAGLAND, ESQUIRE

17      PHILLIPS PARKER ORBERSON & ARNETT, PLC

18      716 West Main Street

19      Suite 300

20      LOUISVILLE, KENTUCKY  40202

21

22

23

24

25
```

```
 1                    INDEX TO EXAMINATION

 2

 3                                              PAGE

 4   EXAMINATION BY MR. JOHNSON                  4

 5   EXAMINATION BY MR. RAGLAND                220

 6   EXAMINATION BY MR. JOHNSON                238

 7   EXAMINATION BY MR. RAGLAND                252

 8

 9

10

11                    INDEX TO EXHIBITS

12

13                                              PAGE

14   EXHIBIT 1                                 129

15   EXHIBIT 2                                 131

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | DEPOSITION OF ROBERT RAY REED |
| 2 | OCTOBER 2, 2017 |
| 3 | ROBERT RAY REED, called on behalf of the |
| 4 | Defendant, Gulf Coast Enterprises, after having |
| 5 | first been duly sworn, is examined and testifies as |
| 6 | follows: |
| 7 | EXAMINATION |
| 8 | BY MR. JOHNSON: |
| 9 | **Q.**   Good morning, Mr. Reed.  How are you? |
| 10 | **A.**   Good morning.  Yourself? |
| 11 | **Q.**   Good.  Thank you. |
| 12 | If you'd please state your full name for the |
| 13 | record. |
| 14 | **A.**   Robert Ray Reed. |
| 15 | **Q.**   Mr. Reed, my name is Craig Johnson.  I |
| 16 | represent Gulf Coast, and I'll have some questions |
| 17 | for you today. |
| 18 | Any question that I ask you, please note that |
| 19 | it's not meant to pry into your personal life, but |
| 20 | it's meant to ask you questions relative to the |
| 21 | claims that you've presented; okay? |
| 22 | **A.**   Okay. |
| 23 | **Q.**   If I ask you a question today that you |
| 24 | don't understand, just tell me that you don't |
| 25 | understand.  I'll be happy to repeat it or rephrase |

1    That's the way to do it.

2        Q.    Okay.  Any other surgeries?

3        A.    No.

4        Q.    How did you find out about Gulf Coast?

5        A.    I was on unemployment, because I had

6    been laid off at Certified when Willie Holbert sold

7    out.  Then the veteran's employment guy at

8    workforce development, he's like, "Well, there's a

9    company getting a contract on Fort Knox.

10   They're -- they're looking for people, especially

11   disabled people that have a CDL.  They said that's

12   really hard to find."

13     So they put me in touch with -- I think her

14   name's Laketra Williams.  She's another individual

15   that works for the state workforce development,

16   but she specializes in the disabled thing. So I

17   talked to her twice.

18     I had to go get documentation of the

19   disabilities from the VA; bring it to her.  She

20   forwarded that with my other stuff, like my CDL, a

21   copy of that, to Gulf Coast Enterprises, who wound

22   up hiring me.

23       Q.    All right.  Did you have an -- an interview

24   with anybody at Gulf Coast?

25       A.    Not for a long time.  I kept getting called

1    started working there?

2      **A.**    Yes, because they were being cheap,

3    because the Army's not going to pay them for our

4    time unless we're actually on one of the jobs that

5    they have a job number for.  So you did not start

6    until the day they could actually put that job on a

7    job order that the Army is going to pay them for.

8      **Q.**    Okay.  Did -- did you fill out an

9    employment application?

10     **A.**    I think so.

11     **Q.**    And you understand that the position that

12   you were hired for was in the -- as a general

13   maintenance worker?

14     **A.**    Yeah, I just was supposed to be driving --

15     **Q.**    Okay.

16     **A.**    -- because they said they don't have

17   an actual driver position.  They have general

18   maintenance workers, and they have

19   heavy-equipment operators, so -- but they needed

20   heavy-equipment operators for heavy equipment.

21   So they needed CDL drives.  And they said that's

22   what I would do.

23     **Q.**    Okay.

24     **A.**    Repeatedly they said that.

25     **Q.**    And who -- who told you that?

```
 1   every contract on the facility:  Roads and grounds
 2   maintenance, structures, cleaning.  Pretty much
 3   anything -- anything that comes up with a contract,
 4   they want to do, it except for major construction.
 5     They even had guys running the tank wash.
 6   Got to do that in a truck.  It's cool.
 7     Q.   Okay.  Were you provided a job
 8   description at the time that you were employed?
 9     A.   Yeah.
10     Q.   Okay.  A written job description?
11     A.   Well, it was the duties of a general
12   maintenance worker.
13     Q.   Okay.  But that you were provided
14   something in writing?
15     A.   Yeah.  It was like -- it was the duties of a
16   general maintenance worker.
17     Q.   All right.  And do you recall what those
18   duties were?
19     A.   Lifting, packing, carrying, and -- and
20   whatever else.  I'm not -- I'm not for -- for certain.
21     Q.   Okay.
22     A.   And here's the thing with that:  Anybody
23   that can do even half that stuff can't be
24   considered substantially disabled, so they would
25   totally be in violation of their contract.
```

1    **Q.**   Were you supplied anything else at the

2    time that you accepted the employment position

3    with Gulf Coast?

4    **A.**   They have a handbook.

5    **Q.**   Okay.  And did you review that?

6    **A.**   Oh, yeah, a couple of times.  I brought up

7    issues with them on it.

8    **Q.**   Okay.  What kind of issues did you bring

9    up?

10   **A.**   Well, see, one -- one  of my -- one of the

11   things I need to do, and I made that clear to them

12   at the big interview at the hotel, that I do go to the

13   doctor a lot for -- for therapy, to get

14   prescriptions --

15   **Q.**   Uh-huh.

16   **A.**   -- done.  And -- and at that time, I seen

17   the V -- I was going to the VA.  And the VA, they

18   don't open early, and they do not stay open late.

19   And you will be going there during work hours.

20   And you've any -- no idea how long you're going to

21   be there, and they like you to be there early.

22     And they said they had absolutely no problem

23   with that.  So they started harassing me over

24   taking off to go to VA appointments.  And they

25   would try to deny -- I put -- put a request in.  And

 1   they made me put a request in through Gulf Coast

 2   Enterprises or that Global Connections

 3   employment.  I'm not sure.

 4     And then I had to put another one in with the

 5   Ginn Group, but the Ginn Group guys didn't have

 6   to put one in with my company, but they done --

 7   that's basically a form of harassment.  You had to

 8   do both.  Any one of them could turn it down.

 9     They made you to put -- write down exactly

10   why you was going to the doctor on I think it was

11   the Gulf Coast Enterprises one, but Ginn Group

12   people, they didn't have to put down why they was

13   going to the doctor, just that it was a doctor's

14   appointment.

15     So I found that very invasive.  And I -- I think

16   it was probably against HIPAA regulations,

17   because they don't need to know that; just saying,

18   "I'm going to the doctor."

19     And they were sharing that information I was

20   going to doctor, how many times I was going, with

21   fellow employees.  And you know, they tried to say

22   I didn't turn it in soon enough.  And I'd show them

23   in the handbook, "Look right here.  This is how far

24   I'm supposed to turn it in, and I did.  This is like --

25   like even a week prior to how long I was supposed

```
 1   to do it."  And they would just hassle me, hassle

 2   me, hassle me, hassle me.

 3     Q.   Okay.  When you say they were hassling

 4   you, who are -- who are you referring to

 5   specifically?

 6     A.   Gary Matthews, pretty much Dennis

 7   Vandiver [phonetic], they were sharing that

 8   information with -- with Aubrey Raines.  He was,

 9   like, their little pet disabled dude.  And he pretty

10   much got away with everything.

11     They would share all this information with

12   him, because there's like -- twice Aubrey Raines

13   told me, because Aubrey Raines liked to let people

14   know he knew stuff he wasn't supposed to know.

15     And he kept telling me, "Dennis told me that

16   they're -- you know, the next time work slows

17   down, they're going to lay you off like they did all

18   these other disabled people and not hire you back,

19   because they don't like how often you take off to

20   go to -- to the therapist for" --

21     Q.   Okay.

22     A.   -- "for PTSD," you know, or this or that.

23   And he shouldn't know that, and that -- I mean,

24   he -- no -- no fellow employee should know your

25   medical business.
```

 1    Q.   Okay.  Let's back up a second.  Tell me

 2  who Gary Matthews is.

 3    A.   He was my supervisor.  He's supervisor

 4  of --

 5    Q.   Okay.

 6    A.   -- roads and grounds, and he works for

 7  the Ginn Group.

 8    Q.   Okay.

 9    A.   I know it's supposed to be pronounced

10  Ginn Group, but I have -- I have a hard time saying

11  that --

12    Q.   Okay.  We'll just --

13    A.   -- without all my teeth, so --

14    Q.   We'll just call it the Ginn Group.

15    A.   Ginn Group.

16    Q.   That's fine.

17    A.   That's cooler, anyways.

18    Q.   Dennis Vandenberg, who is he?

19    A.   Vandiver?  He was what they called a

20  lead.  He is, like, right under Gary Matthews.  And

21  he's the one out and about doing -- you know,

22  checking on the job sites, assigning the jobs, who

23  gets what and whatever.

24    Gary -- Gary Matthew liked to stay in his own

25    little office there.  He would watch Gunsmoke and

1    you know, brothers, sisters, cousins, nephews,

2    nieces, nieces' baby daddies.  None of them are

3    disabled in places of disabled people.  And he got

4    really pissed off.  He didn't want to hear it.  The

5    only thing he said he'd do is he would -- he would

6    speak to them about giving me the accommodations

7    they approved.

8      And Gary Matthews said -- I only put one

9    accommodation, now, because he told a bunch of

10   us standing there you're at [phonetic] later.  And

11   they finally had us write it down and request it,

12   that, "Be careful.  You accommodate yourself out

13   of a job."

14     **Q.**   Okay.  And when did Gary Matthews say

15   that?

16     **A.**   This was about a year after I started, and

17   there was a bunch of people present.

18     **Q.**   Okay.  Who was present when he told you

19   that?

20     **A.**   Pre -- pretty much everybody that worked

21   in roads and grounds that -- that was with Gulf

22   Coast Enterprises.  Find out who was all there at

23   that time, and it -- that's them.

24     **Q.**   Who do you recall being present when Mr.

25   Matthews said that?

1    **A.**   Aubrey Raines and I believe, TJ, a

2    Jeremy Lowe.  That was the wounded warrior that

3    got blowed up in Iraq, and they run him out of

4    there like a dog.  And it was a damn shame what

5    this country's come to.

6    **Q.**   Okay.  Stick with me on who was present

7    when Gary Matthews --

8    **A.**   Well, Aubrey Raines, maybe Rodney

9    Raines.  I'm not sure if he got before or after TJ.

10   And that -- there's another one, I can't remember

11   her name; and myself.

12   **Q.**   Okay.  And where did this conversation

13   take place?

14   **A.**   In the hallway right outside the roads and

15   grounds door in between Gary Matthews' office and

16   the break room.

17   **Q.**   And do you know the exact date that

18   statement was made to you?

19   **A.**   No, but there was a lot of witnesses.  And

20   it wasn't just to me.  It was everybody that was

21   there that had one of them request forms he just

22   handed them.

23   **Q.**   Okay.  So did he make that statement

24   specifically to you or to the group?

25   **A.**   Everybody.  Everybody.

1    Q.   Okay.  And tell me the context?  How did

2    that statement come about?

3    A.   He handed us the forms, and he said,

4    "You've got to fill these out and turn them back

5    into me so I can approve or disapprove them."  And

6    he's like, "You better be really careful, because

7    you can accommodate yourself out of a job."

8    And myself and pretty much everybody there

9    after, we talked about it later.  We all took it as a

10   threat because you could have heard the tone in

11   his voice.

12   Q.   And tell me what form you're referring to.

13   A.   Yeah, one paper.  Everybody had been

14   complaining all year that they're not getting

15   accommodations they promised them.  And so they

16   came out with these papers.

17   And you -- basically, you put your name on it,

18   your employee number, a couple other things.  I

19   don't -- I don't remember what, but you had to put

20   down, you know, what kind of accommodation

21   that -- that you're required.  And you get -- you

22   signed it, dated it, and gave it back to -- to Gary

23   Matthews for approval.

24   Q.   Okay.  Before -- well I guess, when you

25   filled that form out, did you request any

```
 1    between the transmission hop and the brake when
 2    you're on the gas.  And that -- that dang truck
 3    driving is a death sentence.
 4       Q.   Okay.  And you're not physically able to
 5    work as a ground maintenance worker, either?
 6       A.   No, rough territory, uneven ground.  And
 7    they -- that -- they require steel-toed boots, and
 8    you can't put a steel-toed boot on that brace.
 9       Q.   Uh-huh.  All right.
10    Are you -- in -- in your mind, are you
11    physically able to work in any employment?
12       A.   No.
13       Q.   Has anyone at Gulf Coast told you that
14    you were terminated from your position?
15       A.   Nope.  We've always wondered about
16    that.
17       Q.   Have you received any written documents
18    or notice that you were terminated?
19       A.   Nothing I know of.
20       Q.   Okay.
21       A.   Because that's probably past the point
22    when they had to respond to any of my attorneys.
23    That -- maybe Ched Jennings might have got
24    something like that.  I don't know.
25       Q.   Did you ever attempt to return to work at
```

1     **Q.**   Okay.  Do you currently possess the

2     ability to work as a ground maintenance work?

3     **A.**   No, definitely not.

4     **Q.**   All right.  Was any adverse employment

5     action taken against you for requesting your

6     accommodation?

7     **A.**   Yeah.

8     **Q.**   Okay.  How so?

9     **A.**   That was right after.  That's when they

10    started up with the Silent Bob thing.  And I wound

11    up going on more difficult jobs, that there were a

12    lot of times when they could have definitely

13    positively put me in a dump truck, because they

14    were hauling rock all day those days.  And I

15    wasn't.  I was going to the tree crew if there was

16    trees available or anything that was difficult.

17      Disney Barracks area, I was going down a

18    couple floors, loading 5-gallon buckets with

19    debris, mostly like concrete and steel from where

20    they were tearing up bathrooms, and packing them

21    up a couple floors, and dumping them through a

22    window into a van.  And they -- they knew I wasn't

23    supposed to be doing that.

24    **Q.**   And tell me how the Silent Bob comment

25    is -- is a, I guess, offensive or derogatory

1    comment?

2      **A.**    Because I don't talk a lot, because I don't

3    like to talk to people.

4      **Q.**    Okay.

5      **A.**    It really upsets me.  It bothers me.  It

6    gives me a lot of anxiety.  So the lunch room is --

7    is very loud.  It's crowded.  There's not much

8    room.  I would sit outside on a bench and eat.  And

9    it's -- I never say much, so I'm like Silent Bob

10   from the movies.

11     **Q.**    And so tell me what movie that they're

12   referring to.

13     **A.**    Jay -- Jay and Silent Bob, Jay and Silent

14   Bob Strike Back, a series of cartoon books.  I

15   think there's actual cartoons.

16     **Q.**    Okay.

17     **A.**    And they're also in the movie Dogma with

18   Ben Affleck.

19     **Q.**    Okay.  And who made reference to you as

20   Silent Bob?

21     **A.**    That would have been Gary Matthews,

22   Dennis Vandiver and a couple of the other Ginn

23   Group workers.

24     **Q.**    Is there any other way that you believe

25   you received an adverse employment action due to

 1    your request for accommodations?

 2     **A.**    Oh, yeah, getting more horrible jobs, jobs

 3    I shouldn't have had.  Oh, Shipley, I was -- I was

 4    filling out my request to go to the doctor to see

 5    the therapist, and on two occasions he -- he would

 6    disapprove it.

 7     And -- and so, I mean -- but he did not

 8    disapprove it until after I had already went to the

 9    doctor.  I'd give it to him a week ahead of time like

10    they wanted, and then when I get back the

11    following day, they was like, "Where were you at?

12    You didn't show up yesterday, you know.  You

13    didn't have off."

14     And I was like, "Well, I never got it back, and

15    I had to go, because these VA appointments are

16    very, very difficult to get.  I mean, really hard.

17    And they don't like it if I don't make them when I

18    have them."  And so at the last minute, Ron

19    Shipley's like, "Oh, you know, you didn't have that.

20    You were supposed to have been here," so. . .

21     **Q.**    Okay.  But with -- with respect to

22    accommodation that you requested regarding

23    your -- your, I guess, physical condition, is there

24    any other way that you believe that you -- that an

25    adverse action was taken against you?

 1    **A.**   I -- just -- just mostly that.

 2    **Q.**   Okay.  And that's what I'm trying out, is

 3   just --

 4    **A.**   Job --

 5    **Q.**   -- as a result of this.

 6    **A.**   -- job stuff, pull -- pulling stuff I ask

 7   requested.  They didn't turn nobody else's down.

 8   And they didn't even refuse mine or turn it down

 9   when they could have still let me know the day

10   before.

11    **Q.**   Okay.  How many times were your doctor

12   office visits disapproved by Ron Shipley?

13    **A.**   Twice.

14    **Q.**   And Ron Shipley was a Gulf Coast

15   employee at the time or a Ginn Group --

16    **A.**   Yeah, they hired him about -- about --

17   about halfway into my time there.

18    **Q.**   Okay.  All right.  So that happened twice.

19   The job assignments issue that you identified,

20   would those be assignments that were made to you

21   by the Ginn Group as opposed to Gulf Coast?

22    **A.**   Well, Gary would tell Dennis Vandiver

23   what jobs needed to be done, and I guess Dennis

24   would assign who went where.  And I don't think

25   SourceAmerica, our human resources, wouldn't

 1   have any input on who did what or where.

 2     **Q.**   You said "SourceAmerica."  Do you mean

 3   Gulf Coast?

 4     **A.**   I mean, Gulf Coast Enterprises.

 5     **Q.**   Okay.

 6         THE REPORTER:  Can I possibly have

 7   another bathroom break?

 8         MR. JOHNSON:  Sure.  This would be a

 9   good time.

10   [WHEREUPON, a brief recess is taken.]

11   BY MR. JOHNSON:

12     **Q.**   Mr. Reed, you provided us with a list of

13   names of individuals that may have some factual

14   knowledge regarding this matter.  I just want to go

15   through that list, and you tell me who you think

16   that person is and what knowledge you believe that

17   they have.

18     The first person is Beth Metzger,

19   M-e-t-z-g-e-r.

20     **A.**   Beth Metzger, that's very, very familiar.

21   I'm bad with names.  I'm trying to place her.  I

22   don't know.  It's --

23     **Q.**   All right.

24     **A.**   I probably got it from somewhere, I don't

25   know.

1    on a daily basis now?  How do you spend your

2    days?

3        A.   I surf -- I surf on the Internet.  I look at

4    houses on the Internet, you know, different places

5    I'd like to live.  Virgin Islands is out now.  It's

6    gone.  I look at motorcycles.  I look at cars.  You

7    know, so a lot -- a lot of that.

8        Talk to the girl a lot when she's home.  She's

9    home on fall break now, so I've got a little bit of

10   company.  It's not too bad.  Pet -- pet the dogs.

11       Watch some news, other TV stuff.  News gets

12   too stressful.  So I watch car shows on -- on TV,

13   and things -- pretty much things like that.  We

14   do -- the wife's said -- that we didn't enough

15   friends, because I don't really like going out and

16   meeting people, so we signed up for American

17   Legion Riders that -- American Legion, because

18   they like motorcycles.  You can talk about

19   motorcycles, a lot of couples there.

20       RA so the wife can relate to them, a lot of

21   female veterans in it with their husbands.  So a lot

22   in common, and we -- we do that.  We haven't been

23   in a while, though.  We should go.

24       Q.   Okay.  Do you go out on your own at all?

25       A.   Only if I really have to and there's

```
 1    nobody around it.  We do, like, the flea markets
 2    together, but I can't do it on my own.  Because a
 3    lot of times we have to take the scooter; or I can
 4    do, like, maybe an indoor one where I can hang
 5    onto a cart and -- and push it around a little bit
 6    real slow, but never -- never really by myself.
 7       Q.   Okay.  Do you drive on your own at all?
 8       A.   Yeah, short distances.
 9       Q.   Okay.
10            THE REPORTER:  I'm sorry.  What did
11    you say?
12            THE WITNESS:  Short distances.
13            THE REPORTER:  Thank you.
14    BY MR. JOHNSON:
15       Q.   Are there any restrictions on your driver's
16    license at all?
17       A.   Well, I couldn't get the CDL anymore with
18    the injuries, but I've got the regular driver's
19    license.
20       Q.   That's what I'm --
21       A.   But they never ask you.  I just -- you
22    know, it's like if you drink too much, you don't
23    drive.  So if I'm too medicated, I don't drive.  I
24    wean off for a day or two ahead of time just
25    enough to be able to safely drive.
```

1    entrance.  We go through the big opulent thing.

2      And to make it more convenient, they put me

3    on a main level deck where I was right next to the

4    main area of the ship with the bar and very noisy

5    all night.

6      Q.   Okay.  June or July of 2016 is when -- is

7    when you went?

8      A.   This -- this year.

9      Q.   Or -- or '17?

10     A.   Yeah, this year.

11     Q.   Okay.  So this was just a couple months

12   ago?

13     A.   Yes.

14     Q.   Okay.  Good.

15     And how long was that cruise?

16     A.   Could -- couldn't afford any better than --

17   than the five-day cruise, and we got it through the

18   travel thing on -- on Fort Knox.  And they -- they

19   cut you a better deal.

20     And -- and that pays for our little girl, so -- so

21   we can just barely afford it; but you can't spend

22   much money while we're on there.

23     Q.   Okay.  Any other out-of-town trips since

24   November 2013?

25     A.   Will that include taking the boy to

 1   college?

 2     **Q.**   Sure.  So you took him to Murray?

 3     **A.**   Yeah, been to Murray a couple of times;

 4   yeah.

 5     **Q.**   Okay.

 6     **A.**   This is the second time down there.  Had

 7   to take him down.

 8     **Q.**   Pick him up?

 9     **A.**   Yeah. Yeah.  Yeah.

10     **Q.**   Okay.

11     **A.**   Back and forth.

12     **Q.**   I know the drill; okay.

13     **A.**   Yeah.  And we took the little girl to UK

14   last weekend, where I -- I had to drop out of the

15   tour.  I only got to see, like -- like, 10% of the

16   campus tour.  I had to go sit back down at -- at the

17   Visitor's Center.  I couldn't complete the tour.

18     **Q.**   Okay.  And so when you-all go to Murray,

19   will you drive?

20     **A.**   My wife usually drives most of the time.

21     **Q.**   Okay.  Do you-all camp at all?

22     **A.**   God, no, not no more.  That sucks.

23     **Q.**   Okay.  Not -- not campers?

24     **A.**   No, not after years -- dad -- dad bought a

25   camper, you know.  He -- he got rid of it real fast.

1    He has the poles up [phonetic] here and there.

2      **Q.**    Okay.  Fair enough.

3      Any other out-of-town trips that you can recall

4    being on since -- since November  13?

5      **A.**    Well, we did a few little ones; yeah.  You

6    know, just -- just mom and dad's get away.  We

7    went to Bowling Green.  We did that.

8      Sometimes I've got to go with my dad to

9    Harlan.  He likes to to go see his -- his parents'

10   grave; to Harlan County, Kentucky, and then over

11   the hill into Virginia and see his parent -- his

12   sister's grave, and then back

13     **Q.**    Okay.  That's a pretty good trip.

14     **A.**    Yeah.

15     **Q.**    All right.

16     **A.**    Right.  Lucky he's got a nice car.

17     **Q.**    Yeah.  And do you drive, or does your dad

18   drive when you go?

19     **A.**    Oh, with dad I've got to take turns.  I -- I

20   partial drive some, but I know ahead of time I've

21   got to lay off the medication for quite some time.

22     **Q.**    Yeah.

23     **A.**    It's a double-edged sword.  As I lay off

24   the medication too long or too much, you know, I

25   don't do too well, you know; but if I'm on it, I can't

1    drive, but I like to help out a little bit.  So I've got

2    to -- I've got to plan everything days -- days, if

3    not weeks, in advance.

4        Q.    Uh-huh.  And how many times have you

5    made the trip to Harlan with your dad since

6    November of  13?

7        A.    Maybe once.

8        Q.    Okay.

9        A.    Maybe twi -- I don't know, maybe twice.

10       Q.    Okay.

11       A.    It's pretty horrible.

12       Q.    And where -- and where is Ms. Reed

13   from?

14       A.    Salisbury, Maryland.

15       Q.    Okay.  Do you-all have any family that

16   lives in any of the surrounding -- in Meade County

17   in the surrounding counties?

18       A.    I have two sisters and a brother-in-law.

19       Q.    Okay.  And what -- what are your sisters'

20   names?

21       A.    Doris and Tina.

22       Q.    Okay.  What are their last names?

23       A.    Doris, her last name is Reed.  And my

24   little sister, I think her last name's Dibble, but we

25   don't talk.